UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE


<u>David Goethel, et al.</u>

       v.             Civil No. 15-cv-497-JL
                      Opinion No. 2016 DNH 127

<u>Penny Pritzker, et al.</u>


**MEMORANDUM ORDER**


This case involves legal challenges to the Magnuson-Stevens
Fishery Conservation and Management Act, 16 U.S.C. §§ 1801 et
seq. ("MSA" or "the Act"), and actions taken thereunder by the
National Marine Fisheries Service ("NMFS").  The plaintiffs are
Hampton, New Hampshire-based commercial fisherman David Goethel,
and XIII Northeast Fishery Sector, Inc. ("Sector 13").[1]  Of
particular relevance is a requirement that commercial fishermen
must, on occasion, be accompanied by at-sea monitors ("ASMs") who
collect certain fishing-related data.  As promulgated by NMFS,
the ASM provision called for the industry to pay the costs of the
monitors.  Nevertheless, the government paid the cost of the
monitors (estimated at $700-$800 per trip) from the inception of

---

[1] A "sector" is a self-selected "group of vessels that have
voluntarily signed a contract and agree[d] to certain fishing
restrictions" regarding, <u>inter alia</u>, catch limits.  <u>Lovgren v.
Locke</u>, 701 F.3d 5, 15-16 (1st Cir. 2012) (citing 69 Fed. Reg.
22,906, 22,945).

the ASM regime in fishing year ("FY") 2012[2] until March 2016, and recently notified the court that it would be "reimbursing some of the industry's [at-sea monitoring] costs" as of July 1.  Doc. no. 69.

Plaintiffs advance several legal arguments in support of their claim that the industry funding requirement is illegal. Generally speaking, however, plaintiffs contend that the defendants lack the legal authority to require fishermen to pay the monitors' costs.  Presently before the court are the parties' cross-motions for summary judgment.[3]  Following a thorough review of the parties' submissions, including the administrative record, the court finds that much of plaintiffs' case is barred by the applicable statute of limitations, and even if timely filed, their claims fail on the merits.  Accordingly, the defendant's motion for summary judgment is granted and the plaintiffs' motion is denied.

---

[2] A "fishing year" (FY) runs from May 1 to April 30 of the following year.

[3] Finding that the governing statutory scheme prohibited preliminary injunctive relief, the court previously denied plaintiffs' request for an injunction to prevent the industry funding requirement from taking effect.  Goethel v. Pritzker, No. 15-cv-497 (D.N.H. Jan. 27, 2016) (doc. no. 44).

# I.  Background

Congress enacted and codified The Fishery Conservation and Management Act, Congress enacted MSA in 1976.  The Court of Appeals noted that it was enacted in "[r]espon[se] to depletion of the nation's fish stocks due to overfishing . . . ." Associated Fisheries of Maine, Inc. v. Daley, 127 F.3d 104, 107 (1st Cir. 1997).  The MSA's codified goals were, inter alia, "to conserve and manage the fishery resources found off the coasts of the United States" and "to promote domestic commercial and recreational fishing under sound conservation and management principles." 16 U.S.C. § 1801(b)(1), (3).  Pursuant to the Act, eight regional Fishery Management Councils ("FMCs") were established "to exercise sound judgment in the stewardship of fishery resources. . . ." Id. §§ 1801(b)(5), 1852(a)(1)(A).  The FMCs are charged with preparing -- and subsequently amending, if necessary -- Fishery Management Plans ("FMPs"), which regulate conservation and management of the fishery.  Id. § 1853(a)(1)(A).

Central to this case is such an amendment:  Amendment 16 ("A16") to the Northeast Multispecies FMP.  This FMP was developed jointly by the New England and Mid-Atlantic Councils in 1985, and addresses groundfish[4] -- those that live on, in, or

---

[4] Species of groundfish within the Northeast Multispecies FMP include different types of cod, haddock, halibut and flounder.  See Northeast Multispecies (Groundfish) Fishery Management Plan Overview, available at

near the bottom of the body of water they inhabit -- which migrate between the waters within the purview of those two FMCs. Amendment 16 had its genesis in the MSA Reauthorization Act, which took effect in January 2007 and established new conservation mandates for all FMPs. Lovgren v. Locke, 701 F.3d 5, 17 (1st Cir. 2012).[5]  In response, the New England Council included in A16 the at-sea monitoring program pursuant to the Reauthorization Act's requirement that FMPs include "measures to ensure accountability" with respect to catch limits.  See 16 U.S.C. § 1853(a)(15); see also Oceana, Inc. v. Pritzker, 26 F. Supp. 3d 33, 39 (D.D.C. 2014).  Accordingly, commercial fishermen within the purview of the Northeast Multispecies FMP must, on occasion, be accompanied by ASMs who collect certain data related to the particular fishing trip and the fishing vessels' catch. 75 Fed. Reg. 18262 (April 9, 2010).

As written, A16 requires that the industry pay the costs of such monitors.  Id. at 18277-78, 18291.  Despite this language, however, the government had paid the ASM costs (estimated at $700-$800 per trip) throughout the program's existence.  In 2015,

---

http://s3.amazonaws.com/nefmc.org/GroundfishFMPOverview.pdf (last visited July 23, 2016).

[5] Amendment 16 had actually been proposed prior to the Reauthorization Act, but the Act's mandates caused the New England Council to delay its implementation.  Lovgren v. Locke, 701 F.3d 5, 17 (1st Cir. 2012).

4

a court ruling required NMFS to fund a particular reporting requirement.  See Oceana v. Locke, 670 F.3d 1238 (D.C. Cir. 2011); 16 U.S.C. § 1853(a)(11).  This requirement depleted NMFS coffers, and in mid-2015, NMFS informed fishery sectors that the industry would have to pay the monitoring costs going forward.  A rule proposed in March and finalized in May of that year made NMFS's position official.  80 Fed. Reg. 12385 (March 9, 2015); 80 Fed. Reg. 25155 (May 1, 2015).  NMFS subsequently updated sectors on the anticipated date of federal funds exhaustion, first projecting October 31 and then, in November, projecting a December 31, 2015 exhaustion.  The projection was extended to March 1, but NMFS announced that funding was exhausted in mid-February 2016.  Nevertheless, NMFS delayed the industry funding requirement until March 1, before recently indicating its reimbursement plan, supra, p. 2.  It is the November 10, 2015, update to which this lawsuit was initially directed.  See Complaint (doc. no. 1).

## II.  **Applicable legal standards**

### A.  **Summary judgment**

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A genuine dispute is one that a reasonable

fact-finder could resolve in favor of either party and a material fact is one that could affect the outcome of the case." Flood v. Bank of Am. Corp., 780 F.3d 1, 7 (1st Cir. 2015).  Reasonable inferences are taken in the light most favorable to the nonmoving party, but unsupported speculation and evidence that "is less than significantly probative" are not sufficient to avoid summary judgment.  Planadeball v. Wyndham Vacation Resorts, Inc., 793 F.3d 169, 174 (1st Cir. 2015) (internal quotation marks omitted).

On cross motions for summary judgment, the standard of review is applied to each motion separately.  Mandel v. Bos. Phoenix, Inc., 456 F.3d 198, 205 (1st Cir. 2006) ("The presence of cross-motions for summary judgment neither dilutes nor distorts this standard of review.").  Accordingly, the court must determine "whether either of the parties deserves judgment as a matter of law on facts that are not disputed." Adria Int'l Group, Inc. v. Ferré Dev., Inc., 241 F.3d 103, 107 (1st Cir. 2001).

## B.  **Administrative Procedure Act**

With some exceptions not pertinent here, Congress authorized judicial review of agency actions taken under the MSA to follow the dictates of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq.  See 16 U.S.C. § 1855(f).  The court's review is limited to the administrative record.  Lovegren, 701

6

F.3d at 20.  As relevant here, the court can set aside agency
action only if such action is found to be:  A) arbitrary,
capricious, an abuse of discretion, or otherwise not in
accordance with law; B) contrary to constitutional right, power,
privilege or immunity; C) in excess of statutory jurisdiction,
authority, or limitations, or short of statutory right; or D)
without observance of procedure required by law.  5 U.S.C.
§ 706(2).  "Because the APA standard affords great deference to
agency decisionmaking and because the Secretary's action is
presumed valid, judicial review, even at the summary judgment
stage, is narrow."  Associated Fisheries of Me., Inc. v. Daley,
127 F.3d 104, 107 (1st Cir. 1997).  Finally, the MSA contains a
30-day statute of limitations.  16 U.S.C. § 1855(f).

### III.  <u>Legal analysis</u>

Plaintiffs claim that the industry funding requirement runs
afoul of the MSA in three different ways:  1) there is no
statutory authority for the requirement; 2) the government failed
to follow required procedural steps in implementing the funding
requirement; and 3) at-sea monitoring is unconstitutional and the
relevant FMPs are invalid.  The defendants dispute the legal
bases for those arguments, but also assert that they are barred
by MSA's 30-day limitations period.  The court turns to that
issue first.

**A.   <u>Statute of limitations</u>**

The MSA requires that suits seeking judicial review of regulations and "actions" taken by the Secretary of Commerce (or her designee) be filed within 30 days after the date on which the regulations are promulgated or the action is published in the Federal Register.  16 U.S.C. § 1855(f).  An "action" is further defined as "actions that are taken by the Secretary under regulations which implement a fishery management plan, including but not limited to actions that establish the date of closure of a fishery to commercial or recreational fishing."  Id. at § 1855(f)(2).

The Secretary argues that the 30-day limitations period began to run when the regulations implementing A16 (which explicitly called for industry funding) went into effect in FY 2012 or, at the latest, in May 2015, when the Rule announcing that industry funding would begin during FY 2015 was published. Plaintiffs argue that the November 10, 2015, notice from the Northeast Fisheries Science Center that federal funds would be exhausted by the end of 2015 triggered the 30-day deadline. Therefore, plaintiffs assert, their December 9, 2015, complaint was timely filed.  The court rejects plaintiffs' argument.  The court need not decide whether the original publication of A16 in 2012 started the 30-day limitations clock because it finds that

the May 15, 2015 Rule explicitly announcing that industry funding would begin during the 2015-16 fishing year is the "action" referred to in 16 U.S.C. § 1855(f).

Plaintiffs argue that the November 10 letter is a separately reviewable "action," i.e., implementation of the ASM funding regulation.  They rely on two cases, Gulf Fishermen's Ass'n v. Gutierrez, 529 F.3d 1321 (11th Cir. 2008) and Oregon Trollers Ass'n v. Gutierrez, 452 F.3d 1104 (9th Cir. 2006).  Neither case, however, can support the weight that plaintiffs assign to them. Gulf Fishermen's Ass'n involved a rule requiring fishing vessels to use a particular vessel monitoring system.  Shortly before scheduled implementation of that rule, NMFS published another rule delaying the effective date by four months.  529 F.3d at 1322.  Suit was filed within thirty days of publication of the second rule, challenging the legality of the monitoring system requirement.  The court rejected the Secretary's statute of limitations defense, observing that "the plain text of § 1855(f) does not preclude judicial review of a regulation beyond thirty days after its publication where there has been subsequent Secretarial action under the regulation."  Id. at 1323 (citing Oregon Trollers, 452 F.3d at 1113).

While plaintiffs go to great lengths to convince the court that the November 10 email notice is an "action" within the meaning of section 1855(f), they ignore additional discussion in

9

Gulf Fishermen's Ass'n and that case's explication of Oregon Trollers which is fatal to their claim.  Specifically, Gulf Fishermen's Ass'n agreed with Oregon Trollers that it is not just agency action," in general, that is separately reviewable, but "actions," in particular, that are "published in the Federal Register," as set forth in section 1855(f).  Id. at 1323-24; (quoting Oregon Trollers, 452 F.3d at 1113).  Indeed, Gulf Fishermen's Ass'n held that "a petition filed within thirty days of the publication of a Secretarial action, as defined in § 1852(f)(2)" is timely. (Emphasis added); see also Green v. Locke, No. 10-707 (MLC), 2010 WL 3614216, (D.N.J. Sept. 8, 2010) (rejecting, in the context of analyzing the MSA's statute of limitations, plaintiffs' claims that permit denials were "actions" within the meaning of § 1855(f)(2) because they were neither "promulgated" nor "published in the Federal Register").  Here, plaintiffs do not claim that the November 10 email notice was a promulgated regulation or that it was published.

The court finds that plaintiffs 30-day window to challenge the industry funding component of ASM closed, at the latest, in June 2015, well before this suit was filed.[6]  As explained below,

_____

[6] Plaintiffs also argue that they could not have brought suit any earlier because such a suit would have been dismissed as unripe.  While necessarily speculative, it seems inconceivable that a suit filed within 30 days of the Rule's publication in May 2016 would have been found unripe.  In addition, as plaintiffs point out, pre-enforcement review is available to aggrieved

however, even if plaintiffs' claims were timely filed, defendant is nevertheless entitled to summary judgment.

**B.   Plaintiffs' substantive claims**

1.   Industry funding is contrary to law

Plaintiffs assert several arguments in support of their allegation that the industry funding component of ASM is contrary to law. 5 U.S.C. § 706(2). None prevail. The court addresses them seriatim.

*a.   Lack of MSA authorization*

Plaintiffs first argue that industry funding is unlawful because it is not authorized by the MSA. While it is true that the MSA does not explicitly authorize industry funding (with one exception to be addressed), the court's inquiry does not end there, as "[t]he power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." Chevron, U.S.A, Inc. v. Nat'l Res. Def. Council, Inc., 467 U.S. 837, 843 (1984) (quoting Morton v. Ruiz, 415 U.S. 199, 231 (1974)).

---

parties and plaintiffs cite no authority which permits the court to waive the statute of limitations applicable to pre-enforcement review.

To start with, the MSA explicitly authorizes at-sea monitors.  16 U.S.C. §§ 1853(b)(8), 1881(b).  Next, the MSA also contains the broad mandate that FMPs shall "contain the conservation and management measures . . . necessary and appropriate for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery[.]"  16 U.S.C. § 1853(a)(1)(A).  Finally, and as explained below, significantly, section 1853(b)(14) allows FMPs to "prescribe such other measures, requirements, or conditions and restrictions as are determined to be necessary and appropriate for the conservation and management of the fishery."

Although it examines a different statutory scheme, this court finds instructive the First Circuit Court of Appeals's treatment of the Federal Power Act's "necessary and appropriate" provision, 16 U.S.C. § 825h, in Boston Edison Co. v. FERC, 856 F.2d 361, 369-70 (1st Cir. 1988).  There, the Court of Appeals concluded that the provision "augments whatever existing powers have been conferred on [the Federal Energy Regulatory Commission] by Congress," although it does not comprise an independent source of authority to act.  See also, Coastal Conservation Ass'n v. United States Dep't of Commerce, Civ. No. 15-1300, 2016 WL 54911 at *4 (E.D. La. Jan. 5, 2016) (describing "necessary and appropriate" language in 16 U.S.C. § 1853(a)(1)(A) as "empowering

12

language represent[ing] a delegation of authority to the
agency.").  NMFS and the Council permissibly found A16's industry
funding provision "necessary and appropriate for the conservation
and management of the fishery" and there is no dispute that the
provision is a "measure, requirement or condition" as
contemplated by 16 U.S.C. § 1853(b)(14).  Accordingly, the court
finds that the MSA does authorize industry funding of monitors.

    Apart from the above statutory language, another provision
of the MSA, added in 1996, demonstrates beyond peradventure that
the MSA contemplates -- and most certainly does not prohibit --
the use of industry funded monitors.  16 U.S.C. § 1858(g)(1)(D)
allows the Secretary to issue sanctions against any vessel owner
or operator who has not made "any payment required for observer
services provided to or contracted by an owner or operator . . ."
(emphasis added).  This provision would be unnecessary if the MSA
prohibited the very type of industry funding at issue in this
case.  See generally, Richards v. United States, 369 U.S. 1, 11
(1962) ("in fulfilling our responsibility in interpreting
legislation, we must not be guided by a single sentence or member
of a sentence, but (should) look to the provisions of the whole
law . . . .") (citation and internal quotation omitted).

    In addition to arguing that the MSA does not authorize
industry funding, plaintiffs also assert that the MSA prohibits
industry funding.  Although not expressly cited by the

13

plaintiffs, this contention is based on the statutory interpretation canon *expresio unius est exclusion alterius*, which instructs that "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." Duncan v. Walker, 533 U.S. 167, 173 (2001); see also United States v. Councilman, 418 F.3d 67, 73 (1st Cir. 2005). Here, plaintiffs point to 16 U.S.C. § 1862(a)(2), which expressly authorizes the imposition of fees to cover the costs of, inter alia, observer coverage in North Pacific fisheries.  From this, they argue that the canon requires a conclusion that the lack of similar express authorization elsewhere in the statute dooms A16's industry funding requirement.[7]

The court disagrees.  The Court of Appeals has cautioned that the canon "is an aid to construction and not an inflexible rule," Hewlett-Packard Co., Inc. v. Berg, 61 F.3d 101, 106 (1st Cir. 1995), and the Pacific Northwest fee mechanism is a substantively different animal than A16's industry funding requirement for at-sea monitoring.  While plaintiffs correctly

---

[7]Relatedly, the plaintiffs argue that if industry funding is implicitly authorized by the MSA, the Pacific Council fee provision would be surplusage, and thus run afoul of the court's obligation "to attempt to give meaning to each word and phrase." United States v. Flores, 968 F.2d 1366, 1371 (1st Cir. 1992)

observe that § 1862 allows Councils to establish a fee schedule, details the requirements of such a schedule and directs how funds received are handled, see id. §§ 1854(d)(2)(A)-(c) and 1862(b),(d), A16's industry-funding provision does not establish, provide for, or in any way implicate fees.[8]  Instead, A16 requires industry contracts with ASM providers, with whom they are free to negotiate contract terms.  See Cumberland Farms, Inc. v. Tax Assessor, State of Me., 116 F.3d 943, 946 (1st Cir. 1997) ("The classic 'regulatory fee' is imposed by an agency upon those subject to its regulation.").  Finally, the court also agrees with the Secretary's analogizing ASM costs to those of mandatory vessel monitoring systems, the cost of which is the responsibility of the vessel owner, although that funding responsibility is not expressly authorized by statute.  See Nat'l Fed'n of Indep. Bus. V. Sebelius, 132 S. Ct. 2566, 2645 (2012) ("Government regulation typically imposes costs on the regulated industry.").  The Secretary also cites to provisions of the Clean Air Act and Clean Water Act which do not specify a particular funding mechanism but pursuant to which the industry funds monitoring equipment.  Doc. no. 72 at 15.  Plaintiffs primarily attempt to diminish the import of these examples through

---

[8]Similarly, plaintiffs list several other fee-based provisions of the MSA in their supplemental memorandum, doc. no. 76 at 2, 4.  For the reasons stated above, these are inapposite.

semantics, referring to them as "true compliance costs" relating to "primary conduct." Doc. no. 76 at 4.  But plaintiffs do not support this purported distinction with any examples of a court invalidating a payment regime such as the one at issue here.

The fact that fees are addressed in § 1862 but not § 1853 does not "support[] a sensible inference" that the MSA forbids an FMP under which industry must bear the cost of certain regulations.  The court therefore declines to rule that the MSA prohibits industry funding of at-sea monitors.

b.  _Industry funding as a tax_

Alternatively, the plaintiffs suggest[9] that industry funding is a tax, which can only be levied by Congress.  Doc. no. 53-1 at 10 (citing Nat'l Cable Television Ass'n, Inc. V. United States, 415 U.S. 336, 340 (1974) ("Taxation is a legislative function, and Congress . . . is the sole organ for levying taxes[.]")).  Again, the court disagrees.  A payment made to a third party vendor (in this case, an at-sea monitor) is not a tax simply because the law requires it.

---

[9] Plaintiffs' argument on this point consists of one sentence and two cited cases.  It is only for the sake of completeness that the court did not decline to address this argument as insufficiently developed.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

As the Court of Appeals has observed, a "'tax' is imposed by a legislature upon many, or all, citizens. It raises money, contributed to a general fund, and spent for the benefit of the entire community." Cumberland Farms, Inc. v. Tax Assessor, State of Me., 116 F.3d 943, 946 (1st Cir. 1997) (quoting San Juan Cellular Tel. Co. v. Pub. Serv. Comm'n, 967 F.2d 683, 685 (1st Cir. 1992)).  Here, payments for ASMs are made directly to the vendors and not to NMFS.[10]  Funds paid by industry sources to third party at-sea monitors are not collected by the government, received by the government, or otherwise available to the government to be expended for any public purpose.  The rates or terms of monitor payments are not set by government officials, or even known to them.  The industry funding of at-sea monitoring does not involve taxation, and thus constitute an unlawful tax.

c. *Anti-Deficiency Act*

Plaintiffs further suggest that the industry funding requirement violates the Anti-Deficiency Act, 31 U.S.C. § 1341(a)(1)(A)-(B), which prohibits federal officers from "mak[ing] or authoriz[ing] an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation" and from "involv[ing] [the United

---

[10] Further, the court is aware of no record evidence or argument that the vendors supplying ASM services remit any of the monies paid by fisherman to any government agency.

States] in a contract or obligation for the payment of money
before an appropriation is made unless authorized by law[.]"
This argument fails because the Anti-Deficiency Act simply has no
bearing on or application to A16's industry funding requirement.
The entire point of industry funding -- in fact, the very reason
the plaintiffs object to it -- is that it requires private
expenditures, not public ones.  There is nothing in the record to
suggest that industry funding of at-sea monitors involves the
government or any government official spending public money,
unappropriated or otherwise, or entering into a contract.  See
Mack Bros. v. Me. State Hous. Auth., No. 2:10-cv-00087-GZS, 2011
WL 2633084, at *12 (D. Me. June 24, 2011) quoting Hercules v.
United States, 516 U.S. 417, 427 (1996) (noting that Act "bars a
federal employee or agency from entering into a contract for
future payment of money in advance of, or in excess of, an
existing appropriation.").  Indeed, the effect of industry
funding is a cessation of government spending.  The Anti-
Deficiency Act is simply not implicated here.

d.  _Miscellaneous Receipts Act_

     The plaintiffs' argument based on the Miscellaneous Receipts
Act fails for reasons similar to its taxation and ADA-based
arguments:  industry funding doesn't involve the receipt of money
by any government entity.  Under 31 U.S.C. § 3302(b), "an

18

official or agent of the Government receiving money for the Government from any source must deposit the money in the Treasury as soon as practicable without deduction for any charge or claim."  As A16 calls for contracting directly with ASM providers, it involves no "official or agent of the Government" receiving money.

Plaintiffs nevertheless argue that the required payments to the ASM providers contracting with the various fishing sectors is "money for the government" because monitoring is a "government program."  Doc. no. 53-1 at 11.  But this semantic argument also fails.  Even if the payments to contractors were somehow considered "money for the government" and used to fund the ASM program,

> "[t]he Miscellaneous Receipts Act cannot in any way be
> construed to prohibit the deposit of receipts of [a]
> self-financing program in a special fund or account
> distinct from that of the general Treasury fund.  All
> the Act literally requires is that miscellaneous money
> received by government officials be deposited in the
> general Treasury."

AINS, Inc. v. United States, 56 Fed. Cl. 522, 539 (2003).  A16 does not provide for -- and is not alleged to provide for -- the receipt of money by government officials.  Accordingly, the industry funding requirement does not run afoul of the Miscellaneous Receipts Act.

*e.  Commerce Clause*

Plaintiffs next allege that the industry-funding requirement for ASMs violates the Commerce Clause of the United States Constitution[11] because it compels sectors to enter contracts with private companies, in contravention of the Supreme Court's mandate in Nat'l Fed'n of Indep. Bus., in which the Court held that the Commerce Clause did not permit the government to "compel individuals to *become* active in commerce by purchas[ing]" health insurance. 132 S. Ct. at 2587 (emphasis in original).  Here, plaintiffs argue, A16 unconstitutionally compels them to enter the market for at-sea monitors.

The Commerce Clause is not a barrier to the enforcement of A16, at least for the reasons advanced by the plaintiff.  The underlying factual premise of this argument is flawed because nothing in the Magnuson-Stevens Act compels at-sea monitoring to begin with.  Fisherman who do not participate in the sector system would not be required to have monitors, regardless of who is paying for them.  See A16 at 861 ("sector vessels will be afforded greater flexibility [, but] will have to bear the administrative costs associated with preparing an environmental assessment as well as the monitoring costs associated with a

---

[11]  Pursuant to art. I, § 8, cl. 3, Congress has the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."

sector manager, dockside monitoring and at-sea monitoring."). Fisherman who do not participate in the sector system fish in the "common pool," which does not require ASM. A16 at 149.

But even if, as plaintiffs assert, the sector system is only theoretically voluntary,[12] the Secretary here, unlike in Nat'l Fed'n of Indep. Bus., is not "regulat[ing] individuals because they are doing nothing." Id. at 2587. As pointed out repeatedly supra at pp. 16-18, nothing in Magnuson-Stevens or A16 taxes, assesses fees, or otherwise penalizes [fishermen] for choosing a course of action (like the sector system) that does not require at-sea monitoring. Instead, the costs of monitors are part of the permissible regulation of plaintiffs' commercial fishing activities. The court finds no Commerce Clause violation based on the arguments advanced by the plaintiffs.

2. Procedural requirements

Plaintiffs next claim that even if the industry funding requirement for ASMs is permissible, NMFS failed to satisfy two procedural requirements imposed by the MSA -- those imposed by the Regulatory Flexibility Act ("RFA"), 5 U.S.C. §§ 603-04 and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332(C). The court addresses these claims in turn.

---

[12] At A16's inception, 55 percent of permit holders joined a sector; these vessels accounted for 98% of the previous decade's catch. Lovgren, 701 F.3d 5.

*a.*  *Regulatory Flexibility Act*

The MSA requires that the Secretary comply with the
Regulatory Flexibility Act.  See 16 U.S.C. § 1855(e).  The RFA
requires agencies to conduct a "regulatory flexibility analysis"
whenever they propose rules that will have "a significant
economic impact on a substantial number of small entities." 5
U.S.C. §§ 601-605.  The agency must prepare an initial analysis
when a proposed rule is published and a final analysis when it
publishes a final rule.  Id. §§ 603(a), 604(a).

There is no dispute that NMFS complied with the letter of
RFA by preparing both the initial analysis and the final
analysis.  Plaintiffs argue, however, that in doing so, the NMFS
insufficiently analyzed the economic impacts on the relevant
fisheries.  But as the Court Appeals has observed, there is no
requirement under the RFA as to the "specific amount of detail"
with which an agency must discuss various alternatives presented
to it.  Little Bay Lobster Co. v. Evans, 352 F.3d 462, 471 (1st
Cir. 2003); see also, City of New Bedford v. Locke, No. 10-10789-
RWZ, 2011 WL 2636863 at *9 (D. Mass. June 30, 2011), aff'd,
Lovgren, supra ("Arguments about the substantive merits of a new
rule . . . are beyond the scope of [the] procedural requirements"
of the RFA).  The court accordingly rejects plaintiffs' RFA-based
argument.

22

*b.  National Environmental Policy Act ("NEPA")*

The MSA also requires NMFS to comply with NEPA, 42 U.S.C. § 4332(c), which, in turn, requires agencies to prepare environmental impact statements prior to implementing "significant acts."  Plaintiffs' argument appears limited to the claim that NMFS failed to adequately assess the economic impact of industry funding, as their briefing makes no mention of environmental concerns.  Doc. no. 53-1 at 15.  This posture is fatal to the argument as a party "must assert an environmental harm in order to come within [NEPA's] zone of interests." Gunpowder Riverkeeper v. F.E.R.C., 807 F.3d 267, 273 (D.C. Cir. 2015) (citing Realty Income Tr. v. Eckerd, 564 F.2d 447, 452 & n.10 (D.C. Cir. 1977); see also, Lexmark Int'l, Inc. v. Static Control Components, Inc., 134 S. Ct. 1377, 1388 (2014) ("presum[ing] that a statutory cause of action extends only to plaintiffs whose interests fall within the zone of interests protected by the law invoked.") (internal quotation and citation omitted)).

Plaintiffs' argument fails substantively as well.  The environmental impact statement issued in conjunction with A16 acknowledged the potential negative consequences of industry funding.  As explained in detail, supra, at pp. 7-10, the time for challenging A16 itself has long passed.  Plaintiffs further argue that the environmental assessment accompanying approval for

23

2015 sector operations plans did not address the transition to industry funding.  This argument fails because supplementation is only required "if the new information is sufficient to show that the remaining action will 'affec[t] the quality of the human environment' in a significant manner <u>or to a significant extent not already considered</u>."  <u>Marsh v. Or. Nat. Res. Council</u>, 490 U.S. 360, 373-74 (quoting 42 U.S.C. § 4332(2)(c) (emphasis added).  Here, the impact of industry funding was already considered, and plaintiffs have failed to identify any new circumstances that would require a supplemental statement.  Accordingly, the court rejects plaintiffs' argument premised on NEPA.

3.  <u>Constitutional claims</u>

   Plaintiffs' final arguments rest on the United States Constitution.  The court notes at the outset that none of the plaintiffs' constitutional arguments challenge *industry funding*; rather, they challenge *at-sea monitoring*, a provision which has long been in place, for which the time to challenge has long expired.  Nevertheless, plaintiffs specifically argue that the ASM requirement itself violates the 4th and 10th Amendments, as well as the Appointments Clause, U.S. Const., art. II, § 2, cl.

2 .[13]  As explained below, the court finds each argument
meritless.

*a.  Fourth Amendment*

Plaintiffs first argue that the presence of at-sea monitors
amounts to an unconstitutional warrantless search.  The court
disagrees.  Even assuming that ASM presence constitutes a search
-- an assumption the Secretary accepts only for purposes of
argument -- warrantless administrative searches of closely
regulated industries are valid.  See New York v. Burger, 482 U.S.
691 (1987).  The test for determining if an industry is "closely
regulated" is whether the regulatory presence is "so pervasive
that business owners cannot help but know that their commercial
properties may be periodically inspected for specific purposes."
Rivera-Corraliza v. Morales, 794 F.3d 208, 217 (1st Cir. 2015)
(citing Burger, 482 U.S. at 705 n. 16)).  So it is here.  See
Lovgren v. Byrne, 787 F.2d 857, 865 n.8 (3rd Cir. 1986) (noting
"pervasive regulation" of the fishing industry "since the
founding of the Republic."); see also Balelo v. Balridge, 724
F.2d 753, 765 (9th Cir. 1984) (applying "closely regulated"
doctrine in holding that presence of monitors to support

---

[13] Earlier in this litigation, plaintiffs also argued that
industry funding of ASM also violated the Third Amendment's
prohibition against quartering of soldiers.  They no longer
advance that claim.

compliance with Marine Mammal Protection Act does not violate
Fourth Amendment, given long national history of commercial
fishing regulation).

Given the closely regulated nature of commercial fishing,
the ASM "searches" are reasonable within the meaning of the
Fourth Amendment if the government has a substantial interest in
regulating the business, the monitors' presence furthers this
interest, and the regulations offer notice to the regulated.
Rivera-Corraliza, 794 F.3d at 216-217.  Here, all three criteria
are met.  Plaintiffs do not seriously dispute the government's
interest -- as expressed by the MSA -- in protecting fishery
resources.  See 16 U.S.C. § 1801.  Nor do they dispute that ASMs
further that interest.  And finally, the explicit provisions of
the MSA give fishermen notice "that the government will conduct
periodic inspections for specific purposes."  Balelo, 724 F.2d at
765 (citing Donovan v. Dewey, 452 U.S. 594, 600 (1981)); 16
U.S.C. §§ 1853(b)(8), 1881b.  On this record, there is no basis
for this court to find or rule that the ASM program does not
violate the Fourth Amendment.[14]

_____

[14] Plaintiffs urge the court to rely on City of Los Angeles
v. Patel, 135 S. Ct. 2443 (2015), in which the Court found that a
municipal code requiring motel operators to provide guest
information to police violated the Fourth Amendment.  In so doing
the Court observed that it had identified only four industries as
"closely regulated."  Id. at 2454.  Commercial fishing was not
one of the four.  The Court, however, did not hold that no other
industry could be considered "closely regulated."  See, Patel,

*b.  Appointments Clause*

The Appointments Clause "makes nomination and confirmation the requisite appointment protocol for what have come to be known as 'principal officers' of the United States but allows Congress to permit a limited class of officials to appoint 'inferior officers' without the need for confirmation." United States v. Hilario, 218 F.3d 19, 24 (1st Cir. 2000) (citing Edmond v. United States, 520 U.S. 651, 659-60 (1997)); U.S. Const., art. II, § 2, cl. 2.  The clause applies only to the appointment of officers "exercising significant authority pursuant to the laws of the United States." Edmond, 520 U.S. at 662-63.

Plaintiffs claim that appointment of members to the various Regional Councils established by the MSA runs afoul of the Appointments Clause because of the extent to which Governors of states within a particular council are involved in those appointments.  Because the Councils do not exercise "significant" authority, the court rejects this argument.  "Significant authority over federal government actions comes from the ability to promulgate, not propose, implementing regulations for a fishery management plan or plan amendment.  Under the [MSA], only

---

135 S. Ct. at 2461 (Scalia, J., dissenting) (listing various industries held by courts of appeals to be "closely regulated"). Given that the Court of Appeals's criteria post-dates Patel and does not restrict "closely regulated" industries to those listed in Patel, this court adheres to the Court of Appeals's criteria as set forth in Rivera-Corraliza, 794 F.3d at 217.

the Secretary of Commerce can promulgate implementing regulations." Nw. Envtl. Def. Ctr., Or., Inc. v. Evans, No. 87-229-FR, 1988 WL 360476 at *8 (D. Or. Aug. 12, 1988); Gulf Restoration Network, Inc. v. Nat'l Marine Fisheries Serv., 730 F. Supp. 2d 157, 174 (D.D.C.) ("the FMP does not constitute final agency action without promulgation of the corresponding regulations:  neither approval of the FMP nor failure to act on it marks the end of the decisionmaking process; nor does the FMP establish any rights or obligations or create any binding legal consequences.  Adoption of implementing regulations is mandatory[.]").

c.  _Tenth Amendment_

   Plaintiffs' final argument is that the inclusion of state marine fishery officials among council members "conscripts" state officers to administer the MSA, in violation of the Tenth Amendment.  See Printz v. United States, 521 U.S. 898, 935 (1997).  The argument warrants little discussion.  State officials are placed on Councils to provide advice regarding state concerns.  See 16 U.S.C. § 1801(b)(5).  They can also influence FMPs through their votes.  16 U.S.C. § 1852 (b)(1)(A). This is not a case of Congress attempting to "conscript state [officials] into the national bureaucratic army." Nat'l Fed. Of Indep. Bus., 132 S. Ct. at 2606-07.  Unlike the Affordable Care

Act at issue in Nat'l Fed. of Indep. Bus., where Congress
intended to penalize states that did not participate in an
expanded Medicaid program, the MSA imposes no penalties or
coerced force where Councils are concerned.  A state which does
not provide a representative will simply not have representation.
The court therefore rejects plaintiff's Tenth Amendment
challenge.

**IV.  Conclusion**

    Ultimately, the voluminous administrative record
demonstrates that A16 -- including the industry funding
requirement -- was the end product of a lengthy period of
deliberation and public comment.  See Lovgren, 701 F.3d at 12
("The N.E. Council adopted . . . Amendment 16[] after 3 years'
work, which included several publications in the federal
register, eight public hearings, and receipt of numerous
comments.").  The record demonstrates that the Secretary received
considerable feedback on the ASM plan in general and the industry
funding aspect in particular.  Some comments from industry
interests supported the monitor requirement and, in at least one
case, expressed the understanding that such costs, while a
potential burden, are an expected expense of doing business.
See doc. no. 58, Ex. 3 (comments by Cape Cod Commercial Hook
Fisherman's Association & Georges Bank Fixed Gear and Hook

Sectors). At the same time, the Secretary received comments from other industry interests pointing out the financial hardship that monitoring costs would create, id. at Exs. 7, 16. Against this legal and factual backdrop, and for the reasons set forth herein, the court finds that plaintiffs' suit is untimely and, in the alternative: 1) that the industry funding requirement is authorized by the MSA and does not violate the Anti-Deficiency Act, The Miscellaneous Receipts Act or the Commerce Clause; 2) that the government did not violate the Regulatory Flexibility Act or the National Environmental Policy Act in implementing the funding requirement; and 3) that Amendment 16 does not violate the 4th or Tenth Amendments.

Accordingly, the Secretary's motion for summary judgment[15] is GRANTED. The plaintiffs' motion for summary judgment[10] is DENIED.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated: July 29, 2016

---

[15] Doc. no. 56.

[10] Doc. no. 53.

30

```
cc:  Eric R. Bolinder, Esq.
     Erica L. Marshall, Esq.
     Ryan P. Mulvey, Esq.
     Stephen S. Schwartz, Esq.
     Pierre A. Chabot, Esq.
     James C. Wheat, Esq.
     Allison C. Finnegan, sq.
     Andrea Gelatt, Esq.
```